IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CHRISTOPHER LEE WILLINGHAM, § § | |
| Plaintiff, § § | |
| v. § § | Case No. 6:23-cv-00082-JAR |
| SHERIFF KEVIN CLARDY, in his § official capacity, and ALICIA MANNING, § in her individual capacity, § § | |
| Defendants. § | |

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Christopher Lee Willingham and hereby brings this First Amended Complaint for damages against Defendants Sheriff Kevin Clardy and Alicia Manning (together, "Defendants") and for his claims against Defendants alleges and states as follows:

### PARTIES

**A.  Plaintiff Christopher Lee Willingham.**

1. Plaintiff Willingham was at all times material herein a resident of Idabel, McCurtain County, Oklahoma.

**B.  Defendant Sheriff Kevin Clardy.**

2. Defendant Clardy is the Sheriff of McCurtain County. At all times material hereto, Clardy was responsible for the policies, practices, and customs of the McCurtain County Sheriff's Office ("MCSO"). Clardy was also responsible for the screening, hiring, training, retention, supervision, discipline, counseling, and control of the MCSO's staff, including Manning. Clardy was the final decision-maker, a policymaker for the MCSO, and supervised its operation and management on a daily basis. As the individual in charge of the MCSO's overall operation and

1

daily management, Clardy was responsible for the implementation of, and adherence to, MCSO policies, procedures, and customs. At all times material hereto, Clardy was acting under color of law and within the scope of his official duties. Defendant Clardy has appeared through counsel.

**C.     Defendant Alicia Manning.**

3.     Upon information and belief, Defendant Manning was at all times material hereto a resident of Idabel, McCurtain County, Oklahoma, and an employee of the MCSO. Manning has appeared through counsel.

4.     Manning is sued in her individual capacity. Upon information or belief, at all times material hereto, Manning was acting under the color of law.

## JURISDICTION AND VENUE

5.     Willingham's claims against Defendants are for violations of federal constitutional rights secured by the First Amendment. Willingham's federal claims are brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

6.     Willingham's state law claims for slander and intentional infliction of emotional distress against Manning are supplemental claims based on state law. This Court has jurisdiction over Willingham's supplemental claims pursuant to 28 U.S.C. § 1367.

7.     Willingham and Defendants reside in this Judicial District. Willingham's causes of action arise in this Judicial District. Venue is proper in the Eastern District of Oklahoma.

## BACKGROUND

8.     Freedom of the press is the bedrock of democracy and human rights. Access to reliable and independent information is paramount. Journalists and reporters—who play an indispensable role in this—find themselves under pressure around the world and right here in McCurtain County, Oklahoma, as governments attempt to silence those who scrutinize their

actions too closely. Journalists and reporters may be victims of threats and harassment, yet the press provides a crucial service necessary for any democracy to function: accountability for public authorities.

9. Plaintiff Christopher Lee Willingham is such a journalist. Willingham has worked as a reporter for the McCurtain Gazette for 18 years. The McCurtain Gazette is a newspaper that was founded in 1905 and located in Idabel, Oklahoma.

A. **Willingham Investigates and Reports on Malfeasance at the MCSO for the McCurtain Gazette.**

10. One of Willingham's beats as a reporter for the McCurtain Gazette is to investigate and report on the MCSO.

11. In 2021, the McCurtain Gazette began investigating multiple allegations at the MCSO brought forward by former and current department employees. The investigation resulted in an eight-part series authored by Willingham that the McCurtain Gazette published between November 21, 2021, and April 24, 2022.[1]

12. On or about November 21, 2021, in the first installment in the series, Willingham reported, among other things, on an emergency meeting of the jail trust board and boxes of reportedly tainted homicide evidence. The article also addressed "rumors . . . spreading among the public and in [Sheriff Kevin Clardy's] own office" of "a sexual relationship between the sheriff and sheriff's department domestic violence investigator Alicia Manning."

13. On or about December 2, 2021, in the second installment in the series, Willingham reported on Clardy appointing Larry Hendrix as a temporary jail administrator at a jail trust special meeting, after which two jail employees, both former sheriff's employees, were immediately fired.

---

[1] The McCurtain Gazette and Willingham covered other controversies at the MCSO. The eight-part series discussed herein contained reporting about the MCSO's intentional interference with the reporting of the McCurtain Gazette, particularly Willingham, in late 2021 and 2022.

14. On or about December 9, 2021, in the third installment in the series, Willingham reported that the "two most prolific investigators of the last five years [were] no longer employed at the sheriff's department, one having resigned after being demoted to patrolman and the other having been fired." The article also reported that Clardy, Hendrix, and Manning "began an investigation as to who was talking to the newspaper." Following an interview with Willingham, Clardy reportedly stated: "Anybody who talks to Chris [Willingham] is fired." Manning reportedly threatened to get search warrants for all deputies' cell phones to see who was talking to the newspaper. Willingham further reported that the McCurtain Gazette received information that Clardy, Hendrix, and Manning were attempting to get a search warrant to seize Willingham's cell phone to identify his sources. The article included additional reports that several current and former officers had begun calling for Clardy to be removed from office on the grounds that he demonstrated habitual or willful neglect of duty, had willful maladministration in office, and had shown gross partiality in office to Manning, who was promoted extremely quickly at the MCSO despite having no prior law enforcement experience.

15. Also, on or about December 9, 2021, in the fourth installment in the series, the McCurtain Gazette published that a MCSO drug dog got loose in an Allen, Texas neighborhood, and bit a young child multiple times, which resulted in the child being hospitalized. The dog was deemed a dangerous animal by a Collin County Judge and banned from the State of Texas. Clardy denied any liability.

16. On or about December 12, 2021, in the fifth installment in the series, the McCurtain Gazette published a letter from former sheriff's narcotics investigator to county commissioners and the newspaper alleging Hendrix failed to investigate a gang rape while head of the Criminal

4

Investigation Division and detailing his accounts of Clardy's and Manning's willful maladministration. The letter stated, among other things:

> Alicia [Manning] just continued to climb ranks at the Sheriff's Office until she made number three in charge. All this with zero experience as a patrolman at all. In charge of all employees, but she really had no idea what those employees do.
>
> The Sheriff's Office admin was extremely mad after the first newspaper came out addressing the rumors. They threatened to write search warrants for everyone's phones to find out who told the paper so that they could fire them. They even talked to some employees and questioned nearly all of them about who was talking. This would cause major problems and a big lawsuit, since a person is allowed to talk to the media and is protected by federal and state law.

17. That same article, authored by Willingham, reported that Manning, third in command at the MCSO behind Clardy and Hendrix, addressed the series of controversies at the MCSO via a Facebook post as follows:

> The only people who suffer at the hands of power plays, politics and personal agendas are the victims of crimes. The real things we don't talk about.
>
> I am not going to stoop to the level of character assassinations and boy there are plenty.
>
> I am confident that God will deal with everyone. Pay $0.75 cents[2] for that.

18. On or about December 23, 2021, in the sixth installment in the series, Willingham reported that Clardy appointed Manning's brother, Mike Manning, to undersheriff of the MCSO, and the county jail trust voted to make Hendrix the new county jail administrator. The article further stated:

> In the past month there has been a mass exodus of employees from the sheriff's department following more than a year's worth of controversies this newspaper has covered in this series. . . .
>
> When this newspaper first contacted the sheriff's department Wednesday to confirm [Mike] Manning was the new undersheriff, the call was first cut off

---

[2] A copy of the weekend edition of the McCurtain Gazette—the edition that Willingham's story appeared in—costs exactly $0.75.

>when a reporter asked who the undersheriff was. A reporter called back and asked to speak to the sheriff and was told he was not available Wednesday.
>
>Reporters then went to the sheriff's department with a state statute stating the sheriff must provide a list of current undersheriff and deputies, and the information is available to the public upon request. At that point, a reporter was allowed to interview [Mike] Manning.

19. On or about January 20, 2022, in the seventh installment in the series, Willingham reported that Clardy violated the law by refusing to disclose 53 crime reports to Willingham under the Oklahoma Open Records Act ("ORA"). Notably, Clardy's purported reasoning was that those reports concerned a juvenile or domestic violence victim and could not be discussed in order for the MCSO to comply with a Violence Against Women Act grant, which funded Manning's salary at the MCSO.

20. On or about April 24, 2022, in the eighth installment in the series, Willingham reported that documents recently received by the McCurtain Gazette stated that the Federal Bureau of Investigation and Oklahoma State Bureau of Investigation were investigating the March 13 in-custody death of Bobby Barrick. The article further stated that the MCSO denied eight ORA requests for documents by the McCurtain Gazette relating to the death. After the MCSO denied the newspaper's ORA requests, the McCurtain Gazette contacted the Oklahoma Press Association, which handles press legal matters. Those eight ORA refusals were preceded by nearly six months of difficulty by the newspaper in obtaining basic reports and records despite transparency and cooperation by Clardy in his first term and previous other sheriffs, dating back to the early 1980s. The Oklahoma Press Association thought the incident could be a precedent-setting case nationally and forwarded the ORA requests, as well as the series of stories into controversies at the MCSO, to the Reporter's Committee for Freedom of the Press ("RCFP") in Washington, D.C. Lawyers for the RCFP reviewed the newspaper's stories and ORA requests and believed the paper was entitled

to the documents being requested under the ORA. Through the RCFP's efforts, the McCurtain Gazette received limited documentation relating to the March 13 death of Bobby Barrick, giving rise to Willingham's April 24, 2022 article.

B. **Manning Retaliates Against Willingham for Articles He Wrote on Behalf of the McCurtain Gazette Covering the MCSO's Misconduct.**

21. The McCurtain Gazette and Willingham continued to investigate and report on controversies at the MCSO.

22. Then, on or about June 18, 2022, Manning unlawfully retaliated against Willingham for the articles he had written covering the MCSO's malfeasance. In a teleconference, Manning told a third party that Willingham exchanged marijuana for pornographic videos of children from Ian Highful. Highful was recently arrested for aggravated possession of child pornography, child exploitation, and indecent exhibitions.[3]

23. Additionally, during the June 18, 2022 teleconference, Manning stated that Willingham was "one of them" and named Highful, Brad Porton (a/k/a Thomas Bradley Porton), and Bryan Nicholson. Porton was convicted on three dozen charges involving juveniles and sentenced to what amounts to the rest of his life in prison.[4] Nicholson was found guilty of child sexual abuse and possession of child pornography.[5]

24. The third party understood Manning to be accusing Willingham of committing sexual crimes against children.

25. Manning's statements about Willingham are false, slanderous, go beyond all possible bounds of decency, and are utterly intolerable in a civilized society.

---

[3] *See* https://www.ksla.com/2022/10/07/former-teacher-arrested-several-felonies-including-child-pornography/.
[4] *See* https://www.ksla.com/2022/10/27/mccurtain-authorities-eye-possibility-that-least-2-child-sex-crimes-cases-could-be-connected/.
[5] *See* http://www.ocdw.com/main/wp-content/uploads/2020/04/Nicholson.Bryan-Douglas.pdf.

26. Manning made these (and other) false statements about Willingham in retaliation for articles he wrote about the MCSO as a reporter for the McCurtain Gazette and to destroy his credibility as a reporter and journalist.

C. **Clardy Not Only Fails to Prevent Manning's Retaliation Against and Harassment of Willingham—But Directly Encourages and Contributes to Such Unlawful Conduct.**

27. The MCSO has a long-standing culture and practice of disregarding its written policies.

28. The MCSO has a history of permitting its personnel to engage in unlawful activities, including retaliation and harassment of citizens of McCurtain County, as demonstrated by Willingham's reporting.

29. The MCSO has a long-standing culture, practice, and history of training and/or permitting its law enforcement officers to maintain secrecy and/or to falsify reports regarding harassment and other abuses.

30. The above-summarized acts and omissions were in furtherance of, and consistent with, the policies, customs, and practices that Clardy had previously created, implemented, observed, maintained, and/or tolerated (or in which the MCSO had otherwise previously acquiesced).

31. Clardy not only failed to prevent Manning's retaliation against and harassment of Willingham—but directly encouraged and contributed to such unlawful conduct such that Clardy was the moving force behind Willingham's injury.

32. For example, on March 6, 2023, County Commissioner Mark Jennings[6], Clardy, and Manning specifically discussed harassing, killing, and burying Willingham. County

---

[6] Commissioner Jennings subsequently resigned on April 19, 2023, following the release of the audio recording capturing this March 6, 2023 conversation. As of the date of this filing, neither Clardy, Manning, or Commissioner Beck have followed suit.

Commissioner Robert Beck was also present during this discussion which occurred immediately following the purported close of an open commissioner's meeting. As caught on tape and published on April 15, 2023, in the McCurtain Gazette in an article by Willingham, Manning, Jennings, and Clardy stated the following:

> "Who's got people scared around here," Captain Alicia Manning asked.
>
> "Hmm? I'm not scared of no sonofabitch walking around here," answered Jennings.
>
> "Want to go to the UPS store with me? It's right next door to the newspaper!" Manning relayed.
>
> "I don't think I can contain myself," Manning said.
>
> "Oh, you're talking about you can't control yourself," said Jennings.
>
> "Yeah, I ain't worried about what he's gonna do to me, I'm worried about what I might do to him."
>
> Commissioner Jennings offered another idea. "What you need to do is I'm gonna go with Cody (McDaniel) I'm gonna buy him a worn out tank it's got a, let's see, it's got a bad steering clutch on the left and and we'll go about 30 miles through town, we'll go through that stop sign and just make a detour right through GI and right through make a detour and right through and just say sorry I couldn't stop this motherfucker."
>
> Clardy replied, "You'll have to beat my son to it. He's already got a bright idea he's gonna put rip right in the front door."
>
> Manning went on to boast of times she's intimidated reporter Chris Willingham in public.
>
> "I saw him at Walmart one day, pushing his little buggy with his little six pack in and I mean I was like right here. And I mean I didn't even check up. I not even check up and that little sonofabitch bout wrecked his buggy. And I'm like, what the hell's wrong with you?"
>
> The sheriff also relayed an incident of a deputy intimidating and verbally assaulting the reporter.
>
> "My son the other day, cause, I mean, he doesn't, he doesn't know when to keep his mouth shut. He walked into Choctaw Travel Plaza. Chris was standing in

line when he walked up when he got there. Chris turned around started on, and looked at him and said something to him and Kyler looked at him said 'fuck you motherfucker! Don't talk to me.' Said Chris had a bag of chips and threw it on the counter and said I don't think I need that then turned around and walked out. Kyler said he just started dying laughing."

At one point Jennings expressed his frustration with the newspaper.

"You know when Bruce put that in the paper about the commissioners fucked up on that election deal cause it wasn't run three times, four times," said Jennings. "Cause Karen dingbat-ass didn't put it in the paper. A lot of bull. So this is the lawsuit. I ain't talking bout anything I cant. You know, he said you know someone said call the editor is Bruce….

"Yes," Manning said.

"At lot of people in our county ain't fucking smart enough for that shit," said Jennings. So. Anyway, he read that he said, well I thought that the two new commissioners wasn't be not as corrupt as the old commissioners or the current, or something like that. My dad said he started to go down there and just kill him. He said 'I'm fucking 86 years old ain't got nothing to lose.'

"Well, I think I'll hang out with your Dad awhile," said Manning.

"You know what my papaw would have done?" She asked.

"Whooped his ass. Would have wiped him and used him for toilet paper. Orville would have used him for toilet paper. A shit show," answered Jennings.

"My papaw would have walked his big ass down there and whooped his ass like, like you never would have mentioned my name ever again," said Manning.

From here the conversation turned darker, and the topic of killing the publisher and reporter was discussed.

"I know where two big deep holes are here if you ever need them," said Jennings.

"I've got an excavator," responded Clardy.

"Well, these are already pre-dug," said Jennings.

Later in the meeting the discussion returned to the killing of Chris and Bruce Willingham.

10

"But the thing of it is, you know," Jennings said, "I've known, I've known two or three hit men, they're very quiet guys…"

"Yeah?" Manning responded.

"And would cut no fucking mercy,"

"Yeah," said Manning.

"In Louisiana. Cause this is all Mafia around here."

"Oh yeah," answered Sheriff Clardy.

Manning brought up the topic of also killing Chris Willingham's wife, editor Angie Willingham, but lamented she would shoulder the blame for it.

"Yeah, but here's the reality," Manning said. "If a hair on his wife's head, Chris Willingham's head, or any of those people that really were behind that, if any hair on their head got touched by anybody, who would be the bad guy?"

"One of these days I'm gonna bounce his ass. Give him something…" said Sheriff Clardy.[7]

33. Upon information and belief, the above-referenced policies, customs, and practices of Clardy were well-settled and permeate throughout the MCSO.

## COUNT I: FIRST AMENDMENT CLAIM – RETALIATION
### (Defendant Manning)

34. Willingham realleges and incorporates the preceding paragraphs as if fully stated herein.

35. When Willingham was reporting on the conduct and actions of the MCSO and Manning, he was exercising constitutionally protected rights.

36. Manning, acting under the color of state law as third in command at the MCSO, subjected Willingham to conduct that resulted in the deprivation of his constitutional rights, including freedom of speech and freedom of the press.

---

[7] Chris Willingham, *County Officials Discuss Killing, Burying Gazette Reporters*, McCurtain Gazette, April 15, 2023, at 1.

37. Specifically, in reaction to Willingham's protected First Amendment activities, Manning retaliated against him by attempting to intimidate him, harass him, and impede his ability to report on the governmental activities of Manning and the MCSO, including actions that raise serious questions of competency and misconduct. Manning retaliated against Willingham at least by telling a third party that Willingham exchanged marijuana for pornographic videos of children from Ian Highful and that Willingham was "one of them," naming Highful, Porton, and Nicholson, thereby falsely accusing Willingham of committing sexual crimes against children.

38. Manning's actions were unlawful and would chill an ordinary person in the exercise of First Amendment rights, and Willingham suffered damages as a result of her conduct.

39. Manning acted willfully, knowingly, purposefully, and/or with deliberate indifference to deprive Willingham of his constitutional rights. As a result of the nature of Manning's conduct, Willingham is entitled to recover damages from Manning, including compensatory damages, damages for the impairment of his reputation and personal humiliation, damages for financial and psychological injuries caused by Manning's wrongful conduct, punitive damages, and reasonable attorneys' fees under 42 U.S.C. § 1988(b).

## COUNT II: SUPERVISORY LIABILITY CLAIM
### (Defendant Clardy)

40. Willingham realleges and incorporates the preceding paragraphs as if fully stated herein.

41. In the Tenth Circuit, supervisory liability exists under 42 U.S.C. § 1983. First, the plaintiff must show the defendant-supervisor's subordinate violated his constitutional rights. As alleged in Count I, in reaction to Willingham's protected First Amendment activities, Manning retaliated against Willingham by attempting to intimidate him, harass him, and impede his ability

to report on the governmental activities of Manning and the MCSO, including actions that raise serious questions of competency and misconduct.

42. Then, the plaintiff must show an "affirmative link" between the supervisor and the constitutional violation committed by the subordinate. The "affirmative link" requirement is embodied in three elements of (1) personal involvement, (2) causation, and (3) state of mind. The personal-involvement element is satisfied where the defendant-supervisor was responsible for but failed to create or enforce policies that contributed to the constitutional violation. The causation element is satisfied where the defendant-supervisor set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights. The state of mind element is satisfied where the defendant-supervisor acted with a constitutionally requisite state of mind.

43. Defendant Clardy's actions and inactions satisfy the elements for supervisory liability under 42 U.S.C. § 1983. First, Manning was Clardy's subordinate, as she served as third in command at the MCSO. Clardy was the final decision-maker, a policymaker for the MCSO, and supervised its operation and management on a daily basis.

44. With respect to personal involvement, Clardy, as the head of the MCSO, was responsible for but failed to create or enforce policies at the MCSO that directly contributed to Manning's violation of Willingham's First Amendment rights. Clardy had unofficial policies or customs of failing to train or supervise sheriff deputies with respect to harassment and retaliation. Additionally, Clardy acted with deliberate indifference to these failures. Prior to the acts and omissions alleged herein, Clardy failed to create, adopt, and inculcate appropriate procedures and policies for officers, including supervisory officers such as Manning, at the MCSO; failed to properly train, monitor, supervise, and discipline officers, including supervisory officers such as

Manning, at the MCSO; and failed to otherwise institute adequate procedures and policies that would protect Willingham's rights. Willingham's investigative reporting on the MCSO, as discussed herein, demonstrates this. Clardy's acts and omissions were direct and proximate causes for the injuries complained of by Willingham.

45. Upon information and belief, Clardy was aware of these serious deficiencies in training and supervision. As supervisor, Clardy acted with deliberate indifference. Clardy had actual or constructive notice that his action or failure to act was substantially certain to result in a constitutional violation, and he consciously or deliberately chose to disregard the risk of harm. This is displayed by the discussion on March 6, 2023, in which Manning, Clardy, and Commissioner Jennings—and in the presence of Commissioner Beck—discussed multiple examples of officers, including Manning, harassing Willingham, and discussed committing acts of violence against Willingham or hiring others to do so. During that discussion, Clardy relayed a specific incident of a MCSO sheriff deputy (Clardy's son) intimidating and verbally assaulting Willingham at Choctaw Travel Plaza. Clardy had actual knowledge of numerous and systemic problems with officers at the MCSO (including his own son) harassing or intimidating citizens of McCurtain County, including Willingham. Clardy was deliberately indifferent to the risk that citizens of McCurtain County, including Willingham, would have their constitutional rights violated by officers at the MCSO. Clardy's deliberate indifference caused Willingham's injuries, as Clardy did nothing to intervene or prevent the harassment and promulgation of lies by officers at the MCSO, including Manning.

46. Clardy, as the head of the MCSO, either knew of and acquiesced in the violations of Willingham's constitutional rights or personally directed those violations. There is an affirmative link between the violation of Willingham's constitutional rights and Clardy's actions

and omissions such that Clardy is liable. Clardy's acts and omissions were undertaken under color of state law and operated to deprive Willingham of his constitutionally protected rights. In committing the acts set forth herein, Clardy acted fraudulently, oppressively, maliciously, recklessly, and/or in knowing and conscious disregard of and callous indifference to Willingham's constitutional rights. As a result, Willingham is entitled to recover damages from Clardy as the head of the MCSO, including compensatory damages, damages for the impairment of his reputation and personal humiliation, damages for financial and psychological injuries caused by Manning's wrongful conduct, and reasonable attorneys' fees under 42 U.S.C. § 1988(b).

### COUNT III: SLANDER
**(Defendant Manning)**

47.     Willingham realleges and incorporates the preceding paragraphs as if fully stated herein.

48.     Manning made a false and unprivileged statement about Willingham, which charged with him a crime, tended directly to injure him with respect to his profession as a reporter, and which, by natural consequences, caused actual damages.

49.     In particular, in the June 18, 2022 teleconference, Manning told a third party that Willingham exchanged marijuana for pornographic videos of children from Ian Highful, who was recently arrested for aggravated possession of child pornography, child exploitation, and indecent exhibitions. Additionally, Manning stated that Willingham was "one of them" and named Highful, Porton, and Nicholson. Porter and Nicholson were recently convicted of sex crimes involving children. The third party understood Manning to be stating that Willingham had committed sexual crimes against children.

50.     Manning's statements about Willingham are false and slanderous.

51. Manning's statements falsely charge Willingham with a crime, thus making them slander *per se*.

52. Willingham has suffered damages as a result of Manning's slanderous conduct, including impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.

53. As a result of Manning's conduct, Willingham is entitled to actual and punitive damages, interest, and costs.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(Defendant Manning)**

54. Willingham realleges and incorporates the preceding paragraphs as if fully stated herein.

55. Manning acted intentionally or recklessly in making the false statements about Willingham during the June 18, 2022 teleconference. In particular, Manning stated that Willingham exchanged marijuana for pornographic videos of children from Highful and that Willingham was "one of them," naming Highful, Porter, and Nicholson, wrongfully associating Willingham with sex crimes involving children.

56. Manning's conduct in making these false statements about Willingham was extreme and outrageous.

57. Manning's conduct has resulted in Willingham experiencing severe emotional distress. Upon learning of Manning's false statements about him in or around October 2022, Willingham was physically sick. Willingham and his wife have both experienced panic attacks and difficulty sleeping. Willingham has experienced suicidal thoughts and has sought therapy to manage the overwhelming distress. Manning's false statements have not only impaired Willingham's ability to do his job as a reporter for the McCurtain Gazette, but have also cost him

standing within the community, as well as the loss of sources and friendships. Willingham fears for his personal safety and that of his family—particularly in light of the retaliatory nature of Manning's statements and her position of power within the MCSO.

58. As a result of Manning's conduct, Willingham is entitled to actual and punitive damages, interest, and costs.

## RELIEF REQUESTED

59. Willingham realleges and incorporates the preceding paragraphs as if fully stated herein.

60. As a direct and proximate result of the wrongful and unlawful acts of Defendants, as described above, Willingham was injured, suffered, and continues to suffer damages, including severe emotional distress, anguish, humiliation, indignities, deprivation of constitutional rights, and other damages.

61. As a result of the above-described damages and injuries, Willingham is entitled to recover awards of full compensatory damages against Defendants in amounts to be determined at the trial of this cause.

62. Willingham requests damages in an amount sufficient to compensate him for all injuries and harm he suffered, as well as punitive damages against Manning as provided by law, along with costs of this action, pre- and post-judgment interest as provided by law, reasonable attorneys' fees, and such other and further relief as proves just.

May 11, 2023                                    Respectfully submitted,

*s/ Christin J. Jones*
Cole B. Ramey, Esq.
Karly Stoehr Rodine, Esq. (OK Bar No. 30466)
Christin J. Jones, Esq. (OK Bar No. 32314)
Maeghan E. Whitehead, Esq.
**KILPATRICK TOWNSEND & STOCKTON LLP**
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
Telephone:  (214) 922-7100
Facsimile:  (214) 922-7101
Email:    cramey@kilpatricktownsend.com
          krodine@kilptricktownsend.com
          cjones@kilpatricktownsend.com
          mewhitehead@kilpatricktownsend.com

*Attorneys for Plaintiff*
*Christopher Lee Willingham*


### CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been served upon counsel of record for Defendants via ECF on this 11th day of May, 2023.

Howard T. Morrow
Collins, Zorn & Wagner, P.L.L.C.
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105-1815
(405) 524-2070
(405) 524-2078 (facsimile)
htm@czwlaw.com

/s/ *Maeghan E. Whitehead*
Maeghan E. Whitehead